IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| VICTOR EPSTEIN,<br><br>                Plaintiff,<br><br>vs.<br><br>DES MOINES REGISTER AND TRIBUNE COMPANY, an Iowa Corporation, and GANNETT CO., INC., a Delaware Corporation,<br><br>                Defendants. | No. 4:15-cv-0453-JAJ-CFB<br><br>**ORDER** |

Plaintiff Victor Epstein filed this Motion for Conditional Certification and Court-Authorized Notice on August 19, 2016, asking the Court for conditional certification of a collective action on behalf of himself and a group of similarly situated individuals pursuant to 29 U.S.C. § 216(b) and Local Rule 23. [Dkt. No. 43]. The case arises from Plaintiff's original Petition at Law and Jury Demand, filed November 4, 2015, in the Iowa District Court for Polk County. [Dkt. No. 1-1]. On December 7, 2015, Defendants Des Moines Register and Tribune Company and Gannett Co., Inc. removed the case to this Court [Dkt. Nos. 1, 2, 3], and Plaintiff filed an Amended Complaint on December 14, 2015. [Dkt. No. 4]. Plaintiff's four count amended complaint alleged, on behalf of himself and the potential class, that Defendants violated the Fair Labor Standards Act ("FLSA") and the Iowa Wage Payment Collection Law ("IWPCL") by not compensating employees for all overtime hours worked (Counts I and II), and alleged, on behalf of Plaintiff alone, that Defendants violated the FLSA through retaliatory termination and wrongfully discharged him in violation of public policy (Counts III and IV). [Dkt. No. 4]. Defendants submitted a Motion to Dismiss on December 15, 2015. [Dkt. No. 15]. Plaintiff submitted a Reply Brief on January 28, 2016. [Dkt. No. 17]. On February 3, 2016, this Court granted Defendants' motion to dismiss as to Counts II and IV. [Dkt. No. 19]. For the reasons that follow, Plaintiff's motion for conditional certification and court-authorized notice is **DENIED**.

## I. BACKGROUND

The Des Moines Register and Tribune Company ("the Register") is a news organization located in Des Moines, Iowa, where it produces print and online news content.[1] The Register is a subsidiary of Gannett Co., Inc. The Register employs news reporters to collect, write up, and publish its print and online content, classifying them as Reporter I, II, or III based on level of skill and experience. In late 2014, Gannett reorganized and downsized the Register, including a 15% reduction in newsroom staff. After the reorganization, the Register expected reporters to work more independently, produce their own videos and photos, and engage with the public through social media.

In general, the supervisory and reporting structure of the newsroom remained the same after the reorganization. Reporters are organized into content-based groups known as "news beats." It is common for each beat to contain multiple reporters of varying seniority. Each beat's supervisor is known as a strategist/coach. Before the reorganization, that individual was known as a content editor and "Reporter III" was known was "Senior Reporter." Each supervisor reports to a senior news director. The senior news director reports to the highest-ranking individual on site in Des Moines, the editor. Overtime must be approved by a reporter's supervisor, and overtime budget goals are tied to supervisors' performance evaluations. Decisions related to supervision, reporting, promotion, discipline, and pay are made by those in the supervisory chain and human resources. All reporters are non-exempt employees paid on an hourly basis and use the same system to report their hours. The Register's employee handbook states, "Our strong performance is accomplished by strong performers and the company's expectations of performance are higher than most." All reporters are expected to work as news happens, including unexpected extended hours, evenings, weekends and holidays.

From June 2012 to October 2014, the Register employed Plaintiff Victor Epstein ("Epstein") as a Reporter II in Des Moines. Epstein alleges that the Register violated the FLSA by requiring him to work uncompensated overtime and terminating him in retaliation for reporting the violation. Prior to filing this lawsuit, Epstein filed a complaint regarding the unpaid overtime with the Department of Labor ("DOL"). The DOL found 35 wage and hour violations for the Register's failure to correctly pay overtime. The Compliance Action Report stated that during the investigation,

---

[1] These facts are all taken from the Amended Complaint and the associated pleadings for this motion.

> all former employees (and the one current employee) interviewed stated that they were not paid for all hours worked because they did not record them all. According to them, it was common for employees to not record all their actual hours worked because it may appear that they were unable to do their jobs within a 40-hour week (or using minimum overtime) and they were afraid of being laid-off or fired because of it. Down-sizing was common and lay[-]offs were very real. Also, the newspaper business is small and they were afraid that they would not be hired by another newspaper (or another Gannett-owned newspaper) if they were labeled as troublemakers, not being team players, and/or not good at their jobs.

[Dkt. No. 43-1, quoting Compliance Action Report, Ex. 2, bates p. 2193].

Epstein then filed this lawsuit. The instant motion concerns only the uncompensated overtime claim. Epstein requests conditional certification of a class containing any person who worked at the Register as a Reporter I, III, or III at any time during the three years prior to the filing of the amended complaint. As described by Epstein, the potential class includes all Register reporters employed at any time since December 14, 2012 (including current Register reporters). Epstein alleges that all such reporters are or were similarly situated because they were all subject to the same company policy requiring uncompensated overtime.

Epstein and the Register agree on two points—that all reporters are required to work extended hours as news coverage demands and that the Register has higher performance expectations than other newspapers. [Dkt. No. 43-1, citing Hunter Depo Tr. 103:10-104:12, Employee Handbook, p. 7]. Epstein alleges that: (1) "[r]eporters could not meet their productivity expectations without working overtime[;]" but (2) "reporters were prohibited from working overtime without prior approval." *Id*. (citing Carol Hunter Depo. Tr. 105:110-14, Amended Compl. ¶ 21). Epstein acknowledges that individual supervisors were responsible for the administration and implementation of and compliance with the Register's overtime policy. *Id*. at 9 (emphasizing the importance of budgetary compliance for supervisors, thus making them less likely to approve overtime). The core of his allegation is that, "With reporters unable to meet productivity expectation without working overtime on the one hand, and Defendant's strict overtime policies, practices, and budget on the other hand, the resulting work environment is not surprising: reporters were pressured into working unpaid overtime." *Id*. at 9. Epstein supports this contention with the results of the DOL investigation as well as a 2014 survey of newsroom employees. *Id*. (citing June 20, 2014 chain, Ex. 7, bates p. 1965). The survey indicated reporters may have had a general expectation of working unpaid overtime and a perception that their

3

managers were ignoring the problem. *Id*. A single employee later corroborated the concern, saying that she had been working from home a lot and her manager should have been aware of both the unpaid overtime and the impossibility of doing the job within 40 hours per week. *Id*.

Other than the DOL report and the newsroom survey, he does not provide any evidence to support his allegation that there was widespread pressure to work uncompensated overtime. Rather, Epstein argues that the structure of the Register distributes this "pressure" across the entire reporting staff: because all reporters perform the same job and are subject to the same mechanisms of supervision and pay, they are subject to common productivity expectations and pressure to work unpaid overtime. Epstein also contends this case is at an early stage of litigation, and therefore, a lenient standard should be applied to the conditional class certification.

Defendants argue against conditional certification. First, they argue that Epstein has not presented evidence that anyone other than he felt pressured to work uncompensated overtime. Second, they argue that the reporters are not similarly situated because they covered different beats, worked for different supervisors, worked different hours, and sought (or did not seek) approval for different amounts of overtime. Defendants argue such differences between reporters' individual work experiences mean that each claim would require an individual analysis, leading to unmanageable mini-trials should the Court approve the collective action. Defendants cite the declarations of thirteen different employees plus depositions and the Register's employee handbook to demonstrate the differences between individual reporters' working conditions. Finally, Defendants argue that because discovery has been conducted, the more stringent standard for certification should be applied.

## II. ANALYSIS

Epstein seeks conditional certification of his FLSA claim as a collective action pursuant to 29 U.S.C. § 216(b) and Local Rule 23. He also requests the Court to authorize notice to all potential collective action members. Defendants resist, arguing that: (1) the Register did not have a company policy requiring uncompensated overtime; (2) Epstein has presented only mere allegations there are similarly situated plaintiffs other than himself; and (3) members of the potential class are not similarly situated.

### A. Legal Standard

Section 7 of the FLSA requires that an employer compensate non-exempt employees at least one and one half times their individual hourly wage when they are subjected to a workweek

managers were ignoring the problem. *Id*. A single employee later corroborated the concern, saying that she had been working from home a lot and her manager should have been aware of both the unpaid overtime and the impossibility of doing the job within 40 hours per week. *Id*.

Other than the DOL report and the newsroom survey, he does not provide any evidence to support his allegation that there was widespread pressure to work uncompensated overtime. Rather, Epstein argues that the structure of the Register distributes this "pressure" across the entire reporting staff: because all reporters perform the same job and are subject to the same mechanisms of supervision and pay, they are subject to common productivity expectations and pressure to work unpaid overtime. Epstein also contends this case is at an early stage of litigation, and therefore, a lenient standard should be applied to the conditional class certification.

Defendants argue against conditional certification. First, they argue that Epstein has not presented evidence that anyone other than he felt pressured to work uncompensated overtime. Second, they argue that the reporters are not similarly situated because they covered different beats, worked for different supervisors, worked different hours, and sought (or did not seek) approval for different amounts of overtime. Defendants argue such differences between reporters' individual work experiences mean that each claim would require an individual analysis, leading to unmanageable mini-trials should the Court approve the collective action. Defendants cite the declarations of thirteen different employees plus depositions and the Register's employee handbook to demonstrate the differences between individual reporters' working conditions. Finally, Defendants argue that because discovery has been conducted, the more stringent standard for certification should be applied.

## II. ANALYSIS

Epstein seeks conditional certification of his FLSA claim as a collective action pursuant to 29 U.S.C. § 216(b) and Local Rule 23. He also requests the Court to authorize notice to all potential collective action members. Defendants resist, arguing that: (1) the Register did not have a company policy requiring uncompensated overtime; (2) Epstein has presented only mere allegations there are similarly situated plaintiffs other than himself; and (3) members of the potential class are not similarly situated.

### A. Legal Standard

Section 7 of the FLSA requires that an employer compensate non-exempt employees at least one and one half times their individual hourly wage when they are subjected to a workweek

in excess of 40 hours. 29 U.S.C. § 207. Employers who violate this restriction are liable to affected employees for the amount of their unpaid overtime compensation and "an additional equal amount as liquidated damages." *Id*. § 216(b). "Similarly situated" employees may proceed collectively to recover damages for violations of the FLSA's overtime and record-keeping provisions:

> An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Id*. § 216(b). The FLSA does not expressly define "similarly situated," and the Eighth Circuit has not yet addressed the issue. *See Putman v. Galaxy 1 Marketing, Inc.*, 276 F.R.D. 264, 268–69 (S.D. Iowa 2011). This Court, and others within the Eighth Circuit, have applied the "two-step" approach. *Id*. at 269 (citing as examples *Dietrich v. Liberty Square, L.L.C.*, 230 F.R.D. 574, 576–77 (N.D. Iowa 2005); *Littlefield v. Dealer Warranty Servs.*, L.L.C., 679 F.Supp.2d 1014, 1016 (E.D.Mo.2010) (citing to federal courts that have followed and adopted the two-step approach); *In re Pilgrim's Pride*, No. 1:07–cv–1832, 2008 WL 4877239, at *2 (W.D. Ark. Mar. 13, 2008) (same); *Davis v. NovaStar Mortg, Inc.*, 408 F.Supp.2d 811, 815 (W.D. Mo. 2005) (same); *Parker v. Rowland Express, Inc.*, 492 F.Supp.2d 1159, 1163–64 (D. Minn.2007) (same)).

In *Robinson v. Tyson Foods, Inc.*, this Court explained the two step standard for determining whether plaintiffs are similarly situated for purposes of § 216(b). *Robinson v. Tyson Foods, Inc.*, 254 F.R.D. 97 (S.D. Iowa 2008). In *Robinson*, the Court quoted from the § 216(b) analysis presented in *Dietrich*:

> "A two-tiered analysis distinguishes between conditional class certification, generally made at the 'notice stage,' and a final class certification determination made after discovery is largely completed." *Campbell v. Amana Company, L.P.*, 2001 WL 34152094, at *2 (N.D. Iowa 2001) (citing *Thiessen v. General Electric Capital Corp.*, 996 F.Supp. 1071, 1080 (D.Kan.1998)). Because the initial stage of conditional certification is "based on little or no discovery, the 'burden on plaintiffs is not a stringent one.'" *Id*. (quoting *Hoffmann v. Sbarro, Inc.*, 982 F.Supp. 249, 261 (S.D.N.Y.1997)). Accordingly, "conditional certification of a representative class is generally granted." *Id*. (citing *Thiessen*, 996 F.Supp. at 1080). To establish that conditional certification is appropriate, the plaintiffs "need merely provide 'some factual basis from which the court can determine if similarly situated potential plaintiffs exist.'" *Id*. (quoting *Jackson v. New York Tel. Co.*, 163 F.R.D. 429, 431 (S.D.N.Y.1995)). "Courts have held that plaintiffs can meet this burden

5

> by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs were victims of a common policy or plan that violated the law." *Id*. ((citing *Hoffmann*, 982 F.Supp. at 261); *accord Jackson*, 163 F.R.D. at 432). "The more stringent factual inquiry as to whether the plaintiffs are 'similarly situated' is made only after a more substantial record has been amassed." *Id*.

*Dietrich*, 230 F.R.D. at 576–77 (alterations added).

In *Bouaphakeo v. Tyson Foods, Inc.*, the court further explained that although the burden at the first step is more lenient and does not require existing plaintiffs to show other members of the potential class are actually similarly situated, "'plaintiffs must present more than mere allegations; i.e., some evidence to support the allegations is required.'" *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp.2d 870, 893 (2008) (quoting *Young v. Cerner Corp.*, 503 F.Supp.2d 1226, 1229 (W.D.Mo.2007)). The court continued,

> The supporting evidence should include "evidence that other similarly situated individuals desire to opt in to the litigation" because "'[o]thers' interest in joining the litigation is relevant to whether or not to put a defendant employer to the expense and effort of notice to a conditionally certified class of claimants." *Parker v. Rowland Express, Inc.,* 492 F.Supp.2d 1159, 1164–65 (D. Minn.2007) (quoting *Simmons v. T–Mobile USA, Inc.,* No. H–06–1820, 2007 WL 210008, at *9 (S.D. Tex. Jan. 24, 2007)). In addition to "whether potential plaintiffs have been identified," district courts outside of the Eighth Circuit have evaluated several other factors at this stage to determine the propriety of conditional certification, including "whether affidavits of potential plaintiffs have been submitted, whether there is evidence of a widespread discriminatory plan, and whether, as a matter of sound management, a manageable class action exists." *Jimenez v. Lakeside Pic–N–Pac, L.L.C.,* 2007 WL 4454295, at *2 (W.D. Mich. Dec. 14, 2007) (citing *Olivo v. GMAC Mortg. Corp.,* 374 F.Supp.2d 545, 548 (E.D. Mich.2004)). In sum, "[c]onditional certification in the first step 'requires nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan.'" *Young,* 503 F.Supp.2d at 1229 (quoting *Davis v. NovaStar Mortg., Inc.,* 408 F.Supp.2d 811, 815 (W.D.Mo.2005)).

*Id*. at 894. The two step approach thus allows plaintiffs to move for conditional certification early in the litigation, but also allows defendants to move for decertification at the close of discovery. *Davis*, 408 F.Supp. at 815. Regarding the second step, the court explained, "The stricter post-discovery standard requires plaintiffs to convince the court that the factual record reveals putative plaintiffs are still similarly situated to existing plaintiffs." *Bouaphakeo*, 564 F. Supp. 2d at 893 (internal citations and quotation marks omitted).

Class members must be similarly situated because without such commonality, the litigation is unlikely to answer the question posed by the plaintiffs. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–352 (2011) ("Here respondents wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged reasons for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question . . . .").

### B. First Step or Second Step?

Epstein argues that because he seeks conditional certification and the case is at an early stage of litigation, the Court should apply the more lenient first step. Defendants argue that the Court should apply the second step because Epstein has taken substantial discovery including interrogatories, requests for production of documents, and two 30(b)(6) depositions addressing 13 topics. Although the parties have engaged in discovery over a somewhat extended period of time, the Court has before it only a limited record and the discovery process is far from complete. Therefore, the Court will use the more lenient first step analysis. *See West v. Border Foods, Inc.*, 2006 WL 1892527 at *9 (D. Minn. 2006) ("Here, the parties have engaged in some discovery, such as the exchange of Interrogatories . . . However, the discovery process has not been completed and, as such, we analyze the Plaintiff's Motion under the initial stage of review."). However, the Court will consider all the facts and evidence supporting the parties' motions. *See id.* ("[N]either the remedial purposes of the FLSA, nor the interests of judicial economy[] would be advanced if we were to overlook facts which generally suggest that a collective action is improper."). Therefore, in order to determine whether the employees in this case are similarly situated under the first step of the analysis, the Court—while keeping in mind Epstein bears the burden of proof—will consider all evidence presented by both parties. *See Helmert v. Butterball* 2009 WL 5066759, at *7 (E.D. Ark. Dec. 15, 2009) ("Even at the notice stage of the analysis, a court may consider the pleadings and any affidavits that have been submitted to support or discredit the motion for certification.").

### C. Conditional Certification

Epstein argues that all reporters in the potential class were subject to the same overtime policy and production expectations. He states that because each news beat was subject to the same management, reporting, and payroll structure, the overtime policy was uniformly

administered across the newsroom. The gathering and production of news, however, is nuanced activity.

The Register's alleged overtime policy is almost completely dependent on each employee's subjective interpretation of the overtime restrictions and production expectations, and individual supervisors were the primary influence on each reporter's interpretation of the overtime policy. The supervisors (also called "editors" or "coaches") describe varying methods of dealing with overtime. On the Breaking News beat, former supervisor Lucas Grundmeier states that his reporters were expected to work breaking new stories when they happened without concern for whether such coverage might push them into overtime. [Dkt. No. 45-5, Decl. Lucas Grundmeier ¶¶ 16, 20–23 (explaining that responsibility for balancing the importance of covering a story and paying overtime was with the supervising editor rather than the reporter]. On the Sports Beat, supervisor Zack Creglow holds planning meetings to proactively plan coverage for big events and stays in close communication with his reporters to manage their hours. [Dkt. No. 45-9, Decl. Zack Creglow ¶¶ 9–10]. If a reporter needs more time on a story, Creglow makes the decision about whether to pay the overtime or extend the reporter's deadline. *Id*. at ¶ 11–12. The current Community Content Editor, Charles W. Flesher, prefers to approve all overtime in advance and explicitly instructs his reporters to ask permission prior to working overtime. [Dkt. No. 45-13, Decl. Charles W. Flesher ¶¶ 15–16]. "Weeklies" editor Adam P. Wilson also prefers to approve overtime in advance but is flexible with his reporters because the decision on whether to approve overtime is "highly project specific." [Dkt. No. 45-18, Decl. Adam P. Wilson, ¶¶ 17, 19, 22]. Wilson maintains an open dialogue with his reporters regarding their hours, including encouraging them to flex their schedules as needed to stay under 40 hours but also allowing overtime when breaking news events happen. *Id*. at ¶ 22–23. Overtime requests are reviewed within the context of the individual reporter and the news beat. Supervisors are consistent *only* in that they all require reporters to record all their hours and have a preference for reporters to complete their work within 40 hours.

There is similar variability amongst the reporters. Business beat reporters tend to work standard commercial hours and produce stories steadily throughout each week because that reflects the character of the beat. [Dkt. No. 45-12, Decl. Patt Johnson ¶¶ 5, 19, 20]. On the other hand, music reporters work more hours and produce more stories when there are many events to report on, such as music festivals, symphony concerts, or touring Broadway shows, and fewer

hours when there is little such news to report. [Dkt. No. 45-6, Decl. Matt Leimkuehler ¶¶ 3, 8–15]. However, overtime use by a political reporter covering the caucuses or the legislature is common. [*See* Dkt. Nos. 45-7, 45-8, Decls. of Jason Noble and Brianne Pfannenstiel (describing the varying work schedule and coverage duties of the political reporters)].

Epstein alleges that members of the putative class were unable to meet the Register's productivity expectations without working more than 40 hours per week, and that due to budgetary constraints, supervisors were unwilling to approve such overtime. Therefore, he alleges that reporters within the putative class felt pressure to work uncompensated overtime. He argues, largely, that the structure of the Register facilitates the distribution of this alleged policy across the newsroom. The subjective nature of the policy Epstein describes makes this case unlike FLSA cases where employees were required to abide by an objective company policy, such as donning and doffing protective gear prior to working on a meat production assembly line. *See Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp.2d 870 (2008). Here, the alleged policy is heavily dependent on two subjective factors: (1) each supervisor's interpretation and application of the overtime policy; and (2) each employee's interpretation of the overtime policy as implemented by his or her supervisor. The supervisors' implementation ranges from an expectation of working overtime without asking for approval to a near-prohibition on working overtime without prior approval. In such an environment, even if Epstein's allegation that reporters felt pressured to work uncompensated overtime is true, feelings of being pressured or required to work uncompensated overtime cannot be the result of a company policy.

Due to the above, the proposed class members are not similarly situated. A collective action among a group of individuals with such diverse claims would result in unmanageable mini-trials. As in *Duke*, the plaintiff here asks the Court to certify a class covering an undue number of individual employment decisions without some "glue" to hold the individual claims together. *See Duke*, 564 U.S. at 352. Without an objective, uniform application of the policy to all class members, that "glue" does not exist here. Epstein's introduction of the DOL Compliance Action and the newsroom survey meets his burden of presenting more than a "mere allegation" that additional potential class members exist, but the potential class members are not similarly situated. Because the Register did not have a company policy requiring reporters to work uncompensated overtime and because the potential class members are not similarly

situated, Epstein's request for conditional certification of the class is denied. It is therefore unnecessary to address the specifics of his request to approve notice, and the request is denied.

### III. CONCLUSION

Plaintiff has failed to meet the requirements of the FLSA to certify the proposed collective action because there is no company policy requiring employees to work uncompensated overtime and, therefore, members of the potential class are not similarly situated. Treatment of all of Plaintiff's putative class members' claims in a class action lawsuit would be unmanageable. FED. R. CIV. P. 23(b).

Upon the foregoing,

**IT IS ORDERED** that Plaintiff's motion to certify class is **DENIED**.

**DATED** this 9th day of January, 2017.

_____
JOHN A. JARVEY, Chief Judge
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA